CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
11/13/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| WITHERS BERGMAN LLP,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN SHARIF AND JOHN MOORE,<br><br>Defendants. | Civil Action No. 5:26-cv-00105<br><br>**MEMORANDUM OPINION**<br><br>By: Hon. Thomas T. Cullen<br>United States District Judge |

On August 4, 2026, Plaintiff Withers Bergman LLP ("Withers Bergman") filed this breach-of-contract action against its former clients, Defendants Steven Sharif and John Moore ("Defendants"). (*See* Compl. [ECF No. 1].) But on July 30, 2026—four days before Withers Bergman initiated this action—Defendants filed and served a request for arbitration under the California Mandatory Fee Arbitration Act ("MFAA"), *see* Cal. Bus. & Prof. Code, §§ 6200–6206. The matter is now before the court on Defendants' Motion to Stay Proceedings and Compel Arbitration. (ECF No. 12.) Because the parties are not contractually bound to arbitrate the fee dispute, the court will not compel arbitration. The court will, however, exercise its discretion to stay further proceedings pending the resolution of the ongoing California MFAA arbitration matter.

## I. Statement of Facts and Procedural Background

Withers Bergman is a limited liability partnership engaged in the practice of law with offices located worldwide, including in New York, Connecticut, and California. (Compl. ¶ 10;

*see* ECF No. 12 at 9.) Defendants Steven Sharif and John Moore are spouses who currently reside in Waynesboro, Virginia. (Compl. ¶¶ 11–13.)

On August 14, 2025, while residing in California, Defendants engaged Withers Bergman to represent them "in connection with the sale of [their] real property located at 4955 Rancho Del Mar Trail, San Diego, CA 92130." (*see* ECF No. 12 at 9–21 ("2025 Agreement").) The 2025 Agreement, in relevant part, provides that "the scope of services will include all advice in connection with the sale of your property . . . potential estate planning advice and income tax advice." (2025 Agreement at 1.) The agreement contains a California "choice-of-law" provision (*Id.* at 9) and includes an arbitration clause that requires all disputes within the scope of the agreement to be resolved through confidential binding arbitration governed by the California Arbitration Act ("CAA"), *see* Cal. Code Civ. Proc. §§ 1280–1294.4. (2025 Agreement at 8–9.) The arbitration provision contains an arbitration delegation clause, explaining that "[t]he arbitrator must decide all disputes in accordance with that Act . . . including arbitrability." (*Id.* at 9.) Finally, the agreement provides that, if Defendants later seek legal representation from Withers Bergman in other matters, "this Agreement will apply unless a new written agreement is made." (*Id.* at 1.)

Defendants did, in fact, seek further legal assistance from Withers Bergman in connection with the collapse of Defendants' company, Intrepid Studios, Inc. (*See* Pl.'s Br. Opp. Def.s' Mot. at 4 ("Pl.'s Br.") [ECF No. 15].) On February 6, 2026, after relocating to Virginia,[1]

[1] Between August 2025 and the commencement of this litigation, Defendants moved to Waynesboro, Virginia. (Pl.'s Br. at 5–6.) Although the 2026 Agreement contains Defendants' San Diego, California, residential address (*See* ECF No. 1-2 at 1 ("2026 Agreement")), both parties agree that Defendants executed the contract in Virginia. (*See* Defs.' Br. Supp. Mot. at 5 n.2 ("Defs.' Br.") [ECF No. 13]; Pl.'s Br. at 8–9.)

Defendants entered into another agreement with attorneys Christopher LaVigne and Jordan Garman from Withers Bergman's New York office "in connection with providing advice and pursuing potential litigations relating to recent events involving Intrepid Studios, Inc. (the 'Matter')." (*See* 2026 Agreement at 1.) The 2026 Agreement does not include a choice-of-law provision and contains an arbitration clause distinct from the 2025 Agreement, advising that if "a dispute arises between us concerning our fees, and the amount of the dispute is less than $50,000, you may elect to arbitrate the dispute pursuant to Part 137 of the Rules of the Chief Administrator of the Courts."[2] (*Id.* at 4.) Defendants signed the 2026 Agreement in Virginia and sent a retainer to Withers Bergman on February 7, 2026. (*Id.* at 4–5; Pl.'s Br. at 5, 8–9.) At some point before entering into the 2026 Agreement, Defendants were referred to New York-based Withers Bergman attorney Michael Ruedo for corporate representation. (Defs.' Mot. ¶ 5.)

Between February 1, 2026, and June 30, 2026, Withers Bergman "undertook significant litigation work" on behalf of Defendants in connection with the Intrepid Studios, Inc. ("Intrepid Studios") matter. (*See* Pl.'s Br. at 6; *see generally* ECF No. 22, Exs. C–K ("Invoices").) According to Withers Bergman, in late May, Defendants stopped paying the firm for this work and currently owe an outstanding balance in attorneys' fees exceeding one million dollars. (Pl.'s Br. at 6; *see* Compl. ¶ 33.) These unpaid fees are reflected in invoices for work billed by attorneys for advice and litigation services related to the Intrepid Studios matter across several of Withers Bergman's offices, including Christopher LaVigne, Jordan Garman, and Michael

[2] Part 137 of the Rules of the Chief Administrator of the Courts references a New York dispute resolution program. (*See* Pl.'s Br. at 5.)

Ruedo in the New York office and attorneys based in the firm's California offices. (*See generally* Invoices; Defs.' Mot. ¶ 10.) Defendants dispute these fees, claiming that "Withers' billings vastly exceeded Withers' estimates" (Defs.' Br. at 4), and Defendants filed a request for arbitration of the fee dispute under California's MFAA with the San Diego County Bar Association on July 30, 2026, naming Christopher LaVigne as the attorney to the dispute. (Defs.' Mot. ¶ 15; *id.* at 4 n.2.) Defendants claim that the MFAA records have been updated to reflect Withers Bergman LLP as the named party. (*Id.* at 4 n.2.) On August 3 or 4, 2026,[3] Withers Bergman was served with Defendants' arbitration request, and on August 4, 2026, Withers Bergman filed this breach-of-contract action with the court. (*See generally* Compl.)

On September 22, 2026, Defendants filed a motion to stay proceedings and compel arbitration. (ECF No. 12.) Defendants seek to compel arbitration of the fee dispute and stay these proceedings pending arbitration on two grounds. First, Defendants argue that the 2025 Agreement, including its California choice-of-law provision and the mandatory arbitration delegation clause, is the operative agreement for *all* services rendered by Withers Bergman, because the 2026 Agreement never "expressly rescinded, superseded, or revoked" that agreement. (*See* Defs.' Br. at 5–6.) In the alternative, Defendants contend that certain invoices, such as those billed for "General Corporate Advice" and "Government and Public Relations Advice re Intrepid Studios," are not within the scope of the 2026 Agreement and are instead governed by the 2025 Agreement. (*See id.* at 6–7.) Second, Defendants claim that they are entitled to arbitrate the dispute under the California MFAA, and that the court must enforce

[3] Defendants aver that Withers Bergman was served with the arbitration request on August 3, 2026. (Defs.' Mot. ¶ 15.) Withers Bergman claims that it received notice of the request for arbitration on August 4, 2026. (Pl.'s Br. at 7.)

the MFAA's automatic stay provision. (*See* Defs.' Br. at 8–10.) Withers Bergman argues that the 2026 Agreement is a valid, separately enforceable agreement and that all invoices related to the unpaid fees were billed under the 2026 Agreement that does not compel arbitration of this fee dispute. (*See* Pl.'s Br. at 8–14.) It also contends that the MFAA's mandatory stay provision is not binding on this court and that the circumstances of this case do not justify a discretionary stay. (*See id.* at 14–22.)

## II. STANDARD OF REVIEW

### A. Motion to Compel under the Federal Arbitration Act

The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C § 2. The FAA reflects that arbitration agreements are matters of contract, *see Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010), and that "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted) (first citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); and then citing *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Standford Junior Univ.*, 489 U.S. 468, 478 (1989)).

In the Fourth Circuit, a litigant seeking to compel arbitration under the FAA must demonstrate "(1) a dispute exists between the parties; (2) the dispute falls within the scope of a written, valid agreement that includes an arbitration provision; (3) the parties' agreement relates to interstate or foreign commerce; and (4) the opposing party has failed or refused to

arbitrate the dispute at hand." *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 595 (4th Cir. 2023). "A district court . . . has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2022) (citing *United States v. Bankers Ins.*, 245 F.3d 315, 319 (4th Cir. 2001)). Accordingly, "[i]n deciding whether to compel arbitration, courts must 'engage in a limited review to ensure that the dispute is arbitrable—*i.e.*, that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the scope of that agreement.'" *Hetrick Cos. LLC v. IINK Corp.*, 710 F. Supp. 3d 467, 481 (E.D. Va. 2024) (quoting *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999)).

Several district courts in the Fourth Circuit have recently concluded that the moving party's burden of proof on a motion to compel should be held to a "modified summary judgment" standard "because motions to compel arbitration often require courts to consider evidence outside of the pleadings." *See Gibbs v. Stinson*, 421 F. Supp. 3d 267, 299 (E.D. Va. 2019); *Wolford v. United Coal Co.*, 764 F. Supp. 3d 329, 334 (W.D. Va. 2025); *see also Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 85 n. 3 (4th Cir. 2016) (noting that "[t]his standard is akin to the burden on summary judgment" (quoting *Chorley Enters., Inc. v. Dickey's Barbecue Rests.*, 807 F.3d 553, 564 (4th Cir. 2015)). Under this standard, the district court may consider pleadings and "all relevant, admissible evidence submitted by the parties," and draw all reasonable inferences in favor of the non-moving party. *Hetrick Cos. LLC*, 710 F. Supp. 3d at 481. If no material facts are in dispute, the court will decide whether the parties intended to arbitrate their disputes as a matter of law. *See Chorley Enters., Inc.*, 807 F.3d at 564.

### B. Motion to Stay

"A motion to stay, though not expressly provided for by the Federal Rules of Civil Procedure, is a power inherent in the courts under their general equity powers and in the efficient management of their dockets." *Skinner v. Armet Armored Vehicles, Inc.*, No. 4:12-cv-00045, 2015 WL 540156, at *1 (W.D. Va. Feb. 10, 2025) (internal quotation marks omitted) (quoting *PGM Nutritionals, LLC v. Dornoch Ltd.*, 667 F. Supp. 2d 621, 631 (E.D. Va. 2009)). "Federal district courts have broad discretion to stay an action pending the resolution of independent proceedings that may bear upon the case." *Burns v. Anderson*, No. 1:02-cv-1326, 2006 WL 2456372, at *3 (E.D. Va. Aug. 22, 2006) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). "A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *Levya v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863–64 (9th Cir. 1979).

## III. Discussion

### A. The Parties' Contractual Obligation to Arbitrate

The question governing the present matter is whether the fee dispute "falls within the scope of a written, valid agreement that includes an arbitration provision." *Amos*, 74 F.4th at 595. "[A]rbitration is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). Accordingly, "[t]he first question in any arbitration dispute must be: What have these parties agreed to?" *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024). The Fourth Circuit has recently affirmed the United States Supreme

Court's holding in *Coinbase, Inc. v. Suski*, that "fourth-order disagreements—those about which of '*two* contracts' 'governs' whether a given dispute is subject to arbitration—must be decided by a court using traditional contract principles." *Modern Perfection, LLC v. Bank of America, N.A.*, 126 F.4th 235, 239 (4th Cir. 2025) (citing *Coinbase,* 602 U.S. at 148–49).

Here, there are two agreements with two distinct arbitration clauses. Defendants argue that the 2025 Agreement, with its mandatory arbitration provision and arbitration delegation clause, governs this fee dispute and that an arbitrator must decide which fees are subject to arbitration. (Defs.' Reply Br. at 3 [ECF No. 23].) Withers Bergman maintains that the 2026 Agreement governs this fee dispute and that its arbitration provision, which only applies to fee disputes up to $50,000 and is subject to a New York dispute resolution program, does not apply to the fee dispute at issue. (Pl.'s Br. at 11 n.9.) Accordingly, this dispute resembles a so-called "fourth-order" dispute and the court must first determine which contract governs the dispute according to applicable contract principles before ordering compliance with an applicable arbitration provision, if any. *See Coinbase*, 602 U.S. at 149–50 (finding a "fourth-order" dispute where Coinbase argued that the User Agreement's delegation clause was meant to govern all subsequent agreements, but respondents contended that the parties' second contract containing a forum-selection clause superseded the earlier contract's delegation clause).

**1. The Parties' Two Agreements**

In this diversity action, the court applies the substantive law and choice-of-law rules of the state in which it sits: in this case, Virginia. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 623–24 (4th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–

97 (1941)). "Virginia contract choice[-]of[-]law rules distinguish between actions concerning the performance of a contract, which are governed by the law of the place of performance, and actions concerning the validity or creation of a contract, which are governed by the law of the place of the making of the contract." *United Gov. Sec. Off. of Am. v. Special Operations Grp., Inc.*, 436 F. Supp. 2d 790, 792 (E.D. Va. 2009); *see also Arkla Lumber & Mfg. Co. v. W. Va. Timber Co.*, 132 S.E. 840, 842 (Va. 1926) ("Everything relating to the *making* of the contract is to be governed by the law of the place where it was made; everything relating to the *performance* of the contract is to be controlled by the law of the place of performance." (internal quotation marks omitted)). Withers Bergman's breach-of-contract action involves a claim concerning the performance of the parties' contract—Defendants' failure to pay Withers Bergman for its legal services. (*See generally* Compl.) But Defendants' motion also contests the validity of the 2026 Agreement. (*See* Defs.' Br. at 6–7.) To determine which contract applies to the fee dispute, the court must first address the validity of the 2026 Agreement.

The court concludes that Defendants entered into an enforceable agreement with Withers Bergman for legal advice and services connected to litigation involving Defendants' company, Intrepid Studios, Inc.—the 2026 Agreement. As a general rule, "the nature, validity, and interpretation of contracts are governed by the law of the place where the contract was made." *Maggard v. Essar Global Ltd.*, 16 F. Supp. 3d 676, 681–82 (W.D. Va. 2014) (cleaned up). Virginia law recognizes certain exceptions to the general rule, such as when "the parties clearly intended for the . . . agreement to be governed by the laws of a specific jurisdiction," *Black v. Powers*, 628 S.E.2d 546, 554 (Va. 2006), or when "a contract is made in one jurisdiction but performed in another," *Maggard*, 16 F. Supp. 3d at 682. Here, it is undisputed that the 2026

Agreement was made in Virginia, the place where Defendants signed the agreement and sent the retainer, or in other words, the place where "the last act to complete [the contract was] performed." (Defs.' Mot. at 5 n.2; Pl.'s Mot. at 8–9.) *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005). The agreement contains no choice-of-law provision, and the parties expressly agree that Virginia law governs questions concerning the agreement's validity. (Def.'s Mot. at 5 n.2; Pl.'s Mot. at 8–9.) Neither party argues an exception to the general rule, and the court does not find that any such exception applies.[4] The court, therefore, concludes that Virginia law governs the "nature, interpretation, and validity" of the 2026 Agreement as the place where the agreement was made. *See Maggard*, 16 F. Supp. 3d at 682.

Under Virginia law, a valid contract is formed when the following elements are met: offer, acceptance, and consideration. *See Legal Servs. Corp., v. Client Centered Legal Servs. of Sw. Va, Inc.*, 217 F. Supp. 3d 706, 712 (W.D. Va. 2002). "Mutual assent by the parties to the terms of a contract is crucial to the contract's validity," *Wells v. Weston*, 326 S.E.2d 672, 676 (Va. 1985), and "[t]he manifestation of assent is completed when one party makes an offer and the

[4] Although the litigation in which Withers Bergman represented Defendants occurred in California, it does not appear from the language of the 2026 Agreement and the relevant circumstances that the parties intended for the agreement to be fully performed in one jurisdiction, nor was the agreement, in fact, performed in just one place. *See Maggard*, 16 F. Supp. 3d at 682 ("Because the alleged oral contract was to be performed in multiple jurisdictions, and no jurisdiction appears to have been the principal place of performance, it is governed by the law of the place where it was made . . . ."); *Black,* 628 S.E.2d at 554; *Roberts v. Aetna Cas. & Sur. Co.*, 687 F. Supp. 239, 241 (W.D. Va. 1988). For example, the language of the 2026 Agreement does not specify a jurisdiction. The agreement describes the services to be rendered in general terms, "providing advice and pursuing potential litigations relating to recent events involving Intrepid Studios, Inc.," and it contemplates litigation involving "the laws of other jurisdictions." (*See* 2026 Agreement at 1.) The attorneys with whom Defendants contracted worked in Withers Bergman's New York office and performed some of the legal services under the agreement there. (*See generally* Invoices.) The invoices also reflect that one litigation matter originated in Nevada. (*See* ECF No. 22, Ex. B at 2.) Further, as discussed later in this Memorandum Opinion, Defendants live in Virginia and were directed to pay legal fees to Withers Bergman's Connecticut office, making the place of performance of their contractual obligation either Virginia or Connecticut.

other party accepts that offer," *Legal Servs. Corp.*, 217 F. Supp. 3d at 712 (citing 1 Williston on Contracts § 4:3 (4th ed. 1990)).

Here, Withers Bergman extended an offer to Defendants on February 6, 2026, when the firm sent Defendants an engagement letter for legal advice and representation related to potential litigation involving Defendants' business and directed Defendants to sign the agreement and send a retainer of $150,000 if they wished to engage its services on the matter. (*See* 2026 Agreement at 2.) Defendants accepted the offer when they signed the signature page of that agreement—under the line, "[a]greed to and accepted this 7th day of February, 2026"— and returned the signed copy of the agreement and a $150,000 retainer to Withers Berman. (2026 Agreement at 4; Pl.'s Br. at 5.) Withers Bergman then performed the legal services promised in the agreement and Defendants paid the first several invoices to compensate Withers Bergman for that performance—actions supporting consideration and demonstrating the parties' mutual assent to the agreement's terms. *See McKay Consulting, Inc., v. Rockingham Mem'l Hosp.*, 452 Fed. App'x. 331, 336 (4th Cir. 2011) ("When determining whether mutual assent exists to a degree sufficient to form an enforceable agreement, Virginia courts ascertain whether a party assented to the terms of a contract from that party's words or acts[.] . . .").

Defendants contest the 2026 Agreement's enforceability on the basis that no Withers Bergman representative signed the agreement. They point to language in the "Arbitration and Modification" provision in the 2025 Agreement providing that "[t]his Agreement . . . is intended to contain our entire agreement, and can be modified only by a writing *signed by both of us*," to support their position. (2025 Agreement at 3 (emphasis added); *see* Defs.' Br. at 3.)

But the quoted language pertains to the *modification* of the 2025 Agreement and does not limit the creation of a subsequent, separate contract for services outside the scope of the 2025 Agreement. Indeed, the 2025 Agreement contains a different provision that sets forth the conditions for entering into such a contract. According to *those* terms, a subsequent written agreement to engage Withers Bergman in legal services outside the scope of the 2025 Agreement will govern matters falling within the scope of the subsequent agreement. The 2025 Agreement provides, "[i]f you would like to us provide legal services for other matters, and we agree to do so, it may be necessary to prepare a new written agreement for any such additional services. However, this Agreement will apply unless a new written agreement is made." (2025 Agreement at 1.)

In February 2026, the parties did just that. When Defendants required corporate litigation services, they entered into a new written agreement with Withers Bergman that covered those services. These services were not remotely related to the subject of the 2025 Agreement, which was confined to real estate services connected to Defendants' real property located in California. Moreover, Virginia law does not impose a "signature requirement" to render a contract enforceable; therefore, the fact that Withers Bergman did not sign the 2026 Agreement does not render it invalid or inferior to the 2025 Agreement. *See, e.g.*, *Galloway Corp. v. S.B. Ballard Const. Co.*, 464 S.E.2d 349, 505 (Va. 1995) (finding that "[t]he absence of an authorized signature does not defeat the existence of the contract"). As Withers Bergman aptly notes, "the 2025 Real Estate Services Agreement and the 2026 Litigation Services Agreement can exist simultaneously, each governing the disputes arising . . . under their own scopes." (Pl.'s Br. at 11.) Because the 2026 Agreement is enforceable under Virginia law, it is the

operative agreement over matters within the scope of that agreement. It need not "supersede or revoke" the 2025 Agreement for its terms to govern such matters. (*See* Defs.' Br. at 3.)

**2. The Arbitrability of the Fee Dispute**

Having found that the parties entered into two valid and enforceable agreements, the court concludes that the fee dispute is not arbitrable under either agreement's arbitration provision. First, the court finds no evidence that the fees in dispute fall under the scope of the 2025 Agreement, which contains an arbitration provision applicable only to disputes regarding the "construction or application" of the 2025 Agreement and "the performance of any services under th[e] Agreement." (2025 Agreement at 8.) The invoices clearly reflect that the unpaid fees do not relate, in any way, to the real estate services rendered under the 2025 Agreement, and Withers Bergman does not claim that any fees for work performed under the 2025 Agreement have gone unpaid. (Pl.'s Br. at 4; *see generally* Invoices.) Defendants contend, however, that invoices titled "General Corporate Advice" and "Government and Public Relations Advice *re Intrepid Litigation*" do not fall under the 2026 Agreement or the 2025 Agreement and are therefore governed by the 2025 Agreement. After reviewing the parties' briefs and the invoices referenced therein, the court disagrees.

First, the title of Withers Bergman's invoices, alone, defeats Defendants' argument that work billed under "Government and Public Relations Advice" was not performed under the 2026 Agreement. Withers Bergman notes in its briefs that Defendants omitted the critical "re Intrepid Litigation" component of the invoice entry in its filings. (*See* Pl.'s Br. at 14.) Second, Defendants imply that the "General Corporate Advice" invoices were billed for separate, unrelated representation rendered by Michael Rueda, a New York-based Withers Bergman

attorney whom Defendants purportedly were referred to for corporate representation before entering into the 2026 Agreement. (Defs.' Mot. ¶ 5.) But these entries, too, demonstrate that the "Corporate General Advice" work billed from February to June 2026 by Mr. Rueda was done in furtherance of, or was at least within the scope of, the litigation work and advice performed under the 2026 Agreement.[5] (*See* ECF No. 22, Ex. C at 4, Ex. E at 5–6, Ex. G at 5, Ex. H at 5, Ex. J at 5–6). And Withers Bergman does not claim non-payment of fees for any work done outside of this timeframe. (*See* Compl. ¶¶ 2–3.)

The facts before the court reflect that, from February 2026 to June 2026, Withers Bergman provided legal advice and litigation services related to the collapse of Defendants' company under the 2026 Agreement. (Pl.'s Br. at 4.) Although Mr. LaVigne and Ms. Garman are the only attorneys named in the 2026 Agreement, it advises that "[a]dditional lawyers and legal assistants may be assigned to the Matter in an effort to provide the services in as timely and efficient a manner as possible." (2026 Agreement at 2.) The briefs—and the invoices and exhibits referenced therein—represent an "all-hands-on-deck" approach from Withers Bergman's attorneys, including Mr. Rueda, across multiple offices nationwide to provide those services. (*See, e.g.*, Pl.'s Br. at 6 ("Withers'[s] attorneys spearheaded Defendants' representation in simultaneous proceedings in federal and state courts, and before an administrative tribunal, and requiring emergency briefing and hearings . . . among many other things.").) Indeed, Defendants rely, in part, on the fact that Withers Bergman's California-based attorneys were billed for litigation work under the 2026 Agreement to support their contention that this fee

[5] (*See also* 2026 Agreement at 1 ("Thank you for engaging us to represent you in connection with providing *advice* and pursuing potential litigations relating to recent events involving Intrepid Studios, Inc. (the 'Matter')." (emphasis added)).)

dispute falls under the ambit of the California MFAA. (*See* Def.'s Mot. ¶ 10.) For these reasons, the court finds that the disputed fees are governed by the terms of the 2026 Agreement, alone.

But the arbitration provision in the 2026 Agreement permits arbitration only for fee disputes under $50,000. The dispute at issue is for unpaid fees of over one million dollars and does not fall within the scope of the applicable arbitration provision in the parties' contract. (*See* 2026 Agreement at 4.) Simply put, the parties have not agreed to arbitrate this fee dispute and are not required to arbitrate under the FAA. *See Zanford v. Prudential-Bache Secs., Inc.*, 112 F.3d 723, 726 (4th Cir. 1997) ("Arbitration may only be judicially compelled when the parties have agreed to it, and then only for those kinds of disputes that the parties have agreed to submit to arbitration."). The court, therefore, will not grant Defendants' request to compel arbitration. But for the reasons stated below, the court will exercise its discretion to stay further proceedings in this action pending the resolution of the MFAA proceedings that Defendants have already initiated.

## B. Motion to Stay Proceedings under the MFAA

### 1. The MFAA Stay Provision

Defendants argue, in the alternative, that Withers Bergman is required to arbitrate the dispute under the California MFAA, and they claim that the court must enforce the statute's automatic stay provision, *see* Cal. Bus. & Prof, Code § 6201(c). Withers Bergman counters that, even if the San Diego County Bar Association ("SDCBA") determines that this matter falls under the purview of the MFAA, the court is not bound by the statute's stay provision, because neither procedural nor substantive California law applies to the dispute.

As previously stated, a federal court sitting in Virginia must apply the substantive law of Virginia in a diversity case, including the forum's choice-of-law rules. *See Hitachi Credit Am. Corp.*, 166 F.3d at 623–24 (citing *Klaxon Co.*, 313 U.S. at 496–97.) Virginia choice-of-law provides that "claims relating to performance of a contract shall be governed by the law of the place of performance." *Best Med. Intern v. Tata Elxsi Ltd.*, No. 1:10-cv-01273, 2011 WL 5843627, at *11 (E.D. Va. Nov. 21, 2011) (citing *Chesapeake Supply and Equip. v. J.J. Chase Co.*, 700 F. Supp. 1415, 1417 (E.D. Va. 1988)). Courts in this Circuit applying Virginia law have held that where a breach-of-contract arises from a party's failure to make payments under the terms of the contract, the relevant place of performance is the place where payment is tendered or from which payment is made. *See, e.g.*, *Best Med. Intern*, 2011 WL 5843627, at *1 ("Since Plaintiff[']s payment to Defendant would be made from Virginia, this Court finds that the place of performance as to Defendant's breach-of-contract counterclaim is Virginia."); *Cline-Thomas v. Keels*, No. 2:13-cv-204, 2015 WL 12697642, at *2 (E.D. Va. Mar. 10, 2015) ('[T]he place where payment is to be tendered is a factor to consider in determining the place of performance[] and can be dispositive."); *Bizmark, Inc. v. Air Prods., Inc.*, 427 F. Supp. 2d. 680, 688 (W.D. Va. 2006) (holding that "[t]he place of the payment of a note is determinative of the place of performance of the contract" and applying the law of the payee's principal place of business).

Defendants' right to arbitrate arises from a California statutory scheme and not from any contractual provision. *See* Cal. Bus. & Prof. Code §§ 6200–6206; *Beatie and Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 380 (S.D.N.Y. 2006) ("T]he obligation to arbitrate under the MFAA does not flow from the parties' agreement, but rather from the statute itself.").

Defendants filed their request for arbitration with the SDCBA under the California MFAA on July 30, 2026—four days before this litigation arose. The MFAA's automatic stay provision provides that "[u]pon filing and service of the request for arbitration, the action or other proceeding shall be automatically stayed until the award of the arbitrators is issued or the arbitration is otherwise terminated." *See* Cal. Bus. & Prof. Code § 6201(c). But the court is not bound by this stay provision because California law does not apply to this dispute substantively or procedurally under Virginia's choice-of-law rules. *See Willard v. Aetna Cas. & Surety, Co.*, 193 S.E.2d 776, 778 (1973) ("[M]atters of substantive law are governed by the law of the place of the transaction, and matters of remedy and procedure are governed by the law of place where the action is brought.").

First, Virginia is the forum in which this diversity action was brought, so Virginia law governs procedural matters. *See id.* at 778. Second, Defendants claim that California law applies to this breach-of-contract action, because the litigation performed under the contract took place in California courts. (Defs.' Br. at 5 n.2.) That argument may prevail in a breach-of-contract action related to Withers Bergman's performance under the contract, but here, the breach-of-contract action concerns *Defendants'* non-performance of their only legal obligation under the contract—specifically, Defendants' failure to pay legal fees. *See Equitable Tr. Co. v. Bratwursthaus Mgmt. Corp.*, 514 F.2d 565, 568 (4th Cir. 1975) (finding that the place of payment was the place of performance, because it was the only place where the breaching party could have performed their obligation under the contract); *Nardone v. Nat'l Strategic Grp., LLC*, Nos. 3:21-cv-731 & 3:21-cv-732, 2022 WL 853204, at *4 (E.D. Va. Mar. 22, 2022) (determining that

"the law of the place of performance" was the place where the alleged breaching party performed its obligations under the contract).

Applying Virginia's choice-of-law rules, the relevant place of performance is either Connecticut—Withers Bergman's principal place of business and the place where payment was tendered—or Virginia, the location from which Defendants made the payments. *Best Med. Intern*, 2011 WL 5843627, at *1; *Cline-Thomas*, 2015 WL 12697642, at *2; *Bizmark, Inc.*, 427 F. Supp. 2d. at 688. Either way, California substantive law does not govern the breach-of-contract claim under Virginia's choice-of-law rules. The court, therefore, is not bound by the MFAA's automatic stay provision and need not determine whether the stay provision is substantive or procedural in reaching its conclusion.

**2. Discretionary Stay**

But the court will impose a discretionary stay of the proceedings considering California's public policy goals in enacting the MFAA to resolve attorney-client fee disputes arising within its borders.

The California MFAA is a statutory scheme that sets forth the procedure for resolving attorney-client disputes over fees, costs, or both "charged for professional services by licensees of the State Bar or by members of the bar of other jurisdictions." *See* Cal. Bus. & Prof. Code § 6200(a). The process is voluntary for the client—unless otherwise provided for in writing—but mandatory for an attorney once the client elects arbitration under the statute. *See* Cal. Bus & Prof. Code § 6200(c). The policy purpose behind the MFAA is "to alleviate[] the disparity in bargaining power in attorney fee matters which favors the attorney by providing an effective, inexpensive remedy to a client which does not necessitate the hiring of a second

attorney." *Naegle v. Albers*, 355 F. Supp. 2d 129, 140 (D.D.C. 2005) (internal quotation marks omitted) (quoting *Manatt, Phelps, Rothenberg & Tunney v. Lawrence,* 199 Cal. Rptr. 246, 252 (Cal. App. 2d Dist. 1984)). The MFAA does not apply to "[d]isputes where a licensee of the State Bar of California is also admitted to practice in another jurisdiction or where an attorney is only admitted to practice in another jurisdiction, *and* the attorney maintains no office in the State of California, *and* no material portion of the services were rendered in the State of California." *See* Cal. Bus. & Prof. Code § 6200(b)(1) (emphasis added).

Withers Bergman urges the court to refrain from exercising a discretionary stay, in part, because the arbitration Defendants elected under the MFAA is non-binding and because it contends that its New York-based attorney, Christopher LaVigne, is not subject to the MFAA. (Pl.'s Br. at 17–23.) Defendants aver that the arbitration request has since been modified to name the law firm, "Withers Bergman LLP," as the party to the dispute and that Defendants were represented by Withers Bergman's California lawyers in connection with California litigation—circumstances that fit plainly within the scope of the MFAA. (Defs.' Mot. at 4 n.2; Defs.' Reply Br. at 3.)

The court agrees with Defendants. First, even if Defendants' arbitration request listed only Mr. LaVigne as the attorney to the dispute, the conjunctive language of § 6200(b)(1) exempts attorneys not licensed in California from the MFAA only if they "maintain[] no office in the State of California, *and* no material portion of the services were rendered in the State of California." Cal. Bus. & Prof. Code § 6200(b)(1) (emphasis added). Here, Mr. LaVigne purportedly performed litigation services in California and likely falls within the purview of the MFAA based on the language of the statute. But, if, as Defendants claim, "Withers

Bergman LLP" is the correct party to the action, it is even more likely that this fee dispute falls within the scope of the MFAA, because Withers Bergman's California-based attorneys assisted with litigation in California courts. (Defs.' Mot. ¶ 10.) Accordingly, this fee dispute is likely subject to the MFAA's provision, and the court finds it appropriate to stay proceedings pending the resolution of the arbitration request and subsequent arbitration proceedings.

This decision is in line with rulings by other non-California courts that have considered the MFAA's provisions in breach-of-contract actions for unpaid legal fees. For example, in *Naegele v. Albers*, the District Court for the District of Columbia stayed proceedings pending the completion of arbitration proceedings initiated under the MFAA. 355 F. Supp. 2d at 141. There, the plaintiff was an attorney licensed to practice law in California, the dispute involved California-based litigation, and the events that gave rise to the fee dispute arose in California. *Id.* As with Defendants Sharif and Moore, the clients in *Naegele* had invoked their right to arbitrate the fee dispute under the MFAA *before* the attorney initiated its action with the court. *Id.* In reaching its decision to stay proceedings, the court found that it would "completely defeat" California's policy reasons for enacting the MFAA were litigation to occur simultaneously with MFAA arbitration. *Id.* Moreover, the court noted that "litigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the parties' best interests." *Id.* (internal quotations omitted) (quoting *Nat'l Shopmen Pension Fund v. Folger Adam Sec., Inc.*, 274 B.R. 1, 3 (D.D.C. 2002)). Accordingly, the court stayed judicial proceedings pending completion of the MFAA arbitration proceedings. *Id.* at 132.

Withers Bergman relies on a case from the Southern District of New York to support its position that a discretionary stay is not warranted. (Pl.'s Br. at 21 (citing *Beatie and Osborn*

*LLP*, 431 F. Supp. 2d at 380).) In *Beatie and Osborn LLP*, the court concluded that the plaintiff law firm's failure to comply with the MFAA's notice provision did not deprive the court of subject matter jurisdiction over the law firm's suit to collect unpaid fees. 431 F. Supp. 2d at 382. There, the court's holding turned on a conflicting New York choice-of-law provision in the parties' contract that specifically submitted all disputes to New York courts. *Id.* at 378–80. Under New York's choice-of-law rules, the New York provision prevailed so long as it would not violate the "fundamental public policy" of California. *Id.* at 378. The court determined that the MFAA was not a "fundamental public policy" of California and held that the parties' New York choice-of-law clause prevailed. *Id.* at 381–82. As a result, the court found that the plaintiff law firm was not required to comply with the MFAA's notice provision before initiating the action, even though it had performed litigation services for the client in California courts. *Id.* at 376, 382.

The court faces no such conflict here. The 2026 Agreement does not contain a choice-of-law provision, and the arbitration provision in that agreement does not apply to this fee dispute. Put differently, there is no provision in the 2026 Agreement that conflicts with the MFAA. There are, however, several factors weighing in favor of staying proceedings. First, as stated above, Defendants initiated the MFAA arbitration process before Withers Bergman filed its breach-of-contract action, and the fee dispute likely falls within the scope of the MFAA. That consideration, alone, justifies a discretionary stay pending the resolution of the MFAA arbitration process. *See Burns*, 2006 WL 2456372, at *3 (citing *Landis*, 299 U.S. at 254) ("Federal district courts have broad discretion to stay an action pending the resolution of independent proceedings that may bear upon the case.").

Withers Bergman contends that the non-binding nature of MFAA arbitration weighs against a discretionary stay. (Pl.'s Br. at 17–18.) But whether the outcome is binding or non-binding, allowing judicial proceedings of this fee dispute to proceed concurrently with arbitration on the same issue would undermine California's policy goals in enacting the MFAA, namely creating a separate and inexpensive forum for attorneys and clients to resolve these disputes. *See Naegle*, 355 F. Supp. 2d at 141 (quoting *Meis and Wiate v. Parr, et al.*, 654 F. Supp. 867, 868 (N.D. Cal. 1987) (recognizing "California's substantial interest in providing clients . . . with an 'effective inexpensive remedy . . . which does not necessitate the hiring of a second attorney'")); *see also Vedder Price P.C. v. U.S. Cap. Partners, LLC*, 2017 WL 4180021, at *4 (S.D. N.Y. Sep. 20, 2017) (quoting *Loeb v. Record*, 75 Cal. Rptr. 3d 551, 559 (Cal. Ct. App. 2008) ("Indeed, this automatic stay is an important means of effectuating California's policy goal of 'reduc[ing] the inherent advantage that attorneys would have if such disputes were resolved through lawsuits.'")).

Finally, permitting litigation to proceed may impede Defendants' rights to arbitrate under the MFAA. The MFAA provides that "[a] client's right to request or maintain arbitration under the provisions of this article is waived by the client commencing an action or filing any pleading seeking . . . judicial resolution of a fee dispute to which this article applies." Cal. Bus. & Prof. Code § 6201(d)(1). Although filing *an answer* would not waive Defendants' right to arbitrate, the MFAA's waiver provision precludes Defendants from filing *a counterclaim*, because such a response would seek—to the extent such claim seeks—"judicial resolution" of the fee dispute. *See id.* Defendants would be prevented from filing such a pleading if the court allowed the action to proceed. This potential result further persuades the court that a stay is

warranted. Accordingly, the court will exercise its discretion to stay further proceedings pending the resolution of the MFAA arbitration request and any subsequent arbitration proceedings.

## IV. CONCLUSION

For all these reasons, the court will deny Defendants' motion, in part, as to their request to compel arbitration but will grant the motion, in part, as to Defendants' request to stay these proceedings pending resolution of the California arbitration proceedings. Within 30 days of the completion of the MFAA proceedings, or a denial of Defendants' request to arbitrate, the parties are directed to submit a joint status report informing the court of the outcome of the arbitration proceedings, whether they wish to continue with this case in this venue, and their proposed briefing schedule and deadlines for how this case will proceed from that point forward, if at all.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 13th day of November, 2026.

HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE